Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio




# OPINION

No. 04-11-00295-CR

Anthony Torres **DE LEON**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 175th Judicial District Court, Bexar County, Texas
Trial Court No. 2008CR10045B
Honorable Mary D. Roman, Judge Presiding

Opinion by:    Marialyn Barnard, Justice

Sitting:       Rebecca Simmons, Justice
               Steven C. Hilbig, Justice
               Marialyn Barnard, Justice

Delivered and Filed:  April 18, 2012

AFFIRMED

A jury found appellant Anthony Torres De Leon guilty of murder and sentenced him to confinement for twenty-three years. On appeal, De Leon contends the evidence is insufficient to support the jury's rejection of his claim that the murder was committed under the immediate influence of sudden passion arising from an adequate cause. We affirm.

**BACKGROUND**

From 2006 until August 2008, De Leon lived in, and worked as a manager of, an 11-unit apartment complex in Bexar County.[1] According to Jose Arredondo, he and several others were drinking beer at a picnic table outside the complex on August 26, 2008. The group included Arredondo, De Leon, Pedro Adan, who did not live at the complex, and a resident named Jose. Of this group, Arredondo stated he had a closer relationship with De Leon, who he referred to as "Tony," than any of the other men in the group.

As the men sat outside drinking and talking, Alonzo De La Garza, a resident who was drinking inside his apartment, began coming outside to the picnic table. According to Arredondo, De La Garza was telling Adan to leave because he did not live at the complex. Tensions between Adan and De La Garza escalated, and De La Garza eventually punched Adan. He then threw Adan on the ground and climbed on top of him, continuing to hit him. Arredondo stated he did not see either man with a weapon of any kind.

Arredondo stated that at some point during the fight, he heard De Leon say, "well, now this one is going – is going to pay now. . . . [h]e's a son of a bitch." According to Arredondo, De Leon was referring to De La Garza. Arredondo recounted that the two had a prior physical confrontation. Arredondo said he told De Leon not to get involved in the fight between Adan and De La Garza, but De Leon ignored him. Arredondo stated he saw De Leon hitting De La Garza, and believed De Leon was hitting the side of De La Garza's torso with his hand. However, as he continued to watch, Arredondo saw something "shiny, like something like made out of silver" in De Leon's hand. Arredondo believed De Leon was only hitting De La Garza until he saw the metal object in De Leon's hand. Arredondo testified De Leon was "hitting [De

---

[1] The complex is actually an old military barracks that has been converted into small, one-room apartments.

La Garza] in a way where it was like he was using something to stab as opposed to using a fist to punch." Arredondo ran inside when he saw that because he knew the police would come.

From his kitchen window, Arredondo saw De La Garza walking toward his apartment, holding onto the wall. Arredondo said De La Garza "had blood all over him." The police arrived and Arredondo went downtown with them to give a written statement. In that first statement, Arredondo denied seeing how De La Garza was injured, explaining he was drunk. Approximately two or three months later, however, Arredondo gave a recorded statement to a detective and told the detective about the shiny object in De Leon's hand. Arredondo explained his statements were different because when he gave his first statement he had been drinking, but at the time of his recorded statement "I was in my five senses."

On cross-examination, Arredondo testified he had seen De La Garza start many fights, and described De La Garza as "the grouch" who would "just pick fights." He reiterated his testimony about the fight between De Leon and De La Garza that occurred three months before, stating it was started by De La Garza.

Arredondo admitted that on the night of the stabbing he was drunk, but when pressed stated he was telling the jury what he remembered. He denied ever seeing Adan or De La Garza with a knife.

In addition to Arredondo, the State called numerous law enforcement officials as witnesses, including officers, detectives, a medical examiner, and a 911 operator. The tape of De La Garza's 911 call was authenticated by the operator who took the call, and played for the jury.[2] During that call, De La Garza stated he had been stabbed and needed EMS.

---

[2] De La Garza's brother testified that it was his brother's voice on the 911 and SAFD tapes. The brother stated De La Garza "sounded desperate, like he was pretty hurt. There seems to be some sort of finality."

San Antonio Police Officer Juan Marines testified he was dispatched to the complex after De La Garza's 911 call. When he arrived, he saw blood droplets at the entrance of the complex and followed them. Officer Marines followed the blood trail to De La Garza's apartment. The officer asked De La Garza what happened. At first De La Garza could not respond, and Officer Marines opined that this was because De La Garza "was either choking or suffocating on his own blood." The officer again asked De La Garza what happened. This time, though it was difficult for him to speak, De La Garza said "Tony had done it. Tony had cut him." According to the officer, De La Garza told him a second time that it was "Tony" that cut him, and when the officer asked a third time, De La Garza said it was "Tony De Leon." De La Garza also told the officer "Tony" lived in the same building.

Officer Marines relayed the information he had received about the alleged perpetrator to the dispatcher, advising that "the suspect might still be at the location." He also spoke to other officers who had arrived, giving them De Leon's name and asking them to search for him. Officer Marines then went back and stayed with De La Garza until EMS took him away.

Another SAPD officer, Chris Arroyo, was also sent to the scene of the stabbing. Officer Arroyo had been advised the suspect might still be at the complex. When he arrived, he found Officer Marines with the victim, De La Garza. He heard Officer Marines say the name of the suspect was Tony De Leon. Upon hearing this, Officer Arroyo left De La Garza's apartment to look for De Leon.

As he was looking for De Leon, he heard a voice say, "[w]hat do you need to know." Officer Arroyo walked to the common bath area and saw De Leon coming out of the shower in bloodstained boxer shorts. The officer placed De Leon in handcuffs.

The medical examiner who performed the autopsy, Dr. Jennifer Rulon, testified De La Garza suffered "blunt force injuries" and "sharp force injuries." She explained these injuries were caused by multiple blows and eight stab wounds. Dr. Rulon stated the cause of De La Garza's death was multiple stab wounds and blunt force injuries.

The defense called two witnesses, Abel Ortiz and De Leon. Ortiz, a resident of the complex, knew De Leon and De La Garza. Ortiz testified he "pretty much . . . got along with everybody" at the complex, but he had "problems" with De La Garza. Ortiz stated that about a week before De La Garza was killed, De La Garza "pulled out a knife on me . . . started cussing me." This took place at the apartment complex. Ortiz could not explain what, if anything, De La Garza was angry about, but said De La Garza was always "cussing" at him. He said De La Garza had a problem "with being mad all the time."

The other witness for the defense was the defendant, De Leon. De Leon told the jury his version of the events that resulted in the death of De La Garza. De Leon testified he moved to the apartment complex in 2002 or 2003 and De La Garza moved into the complex in the first part of 2008, approximately six months before the stabbing. He stated things became tense that year because De La Garza was threatening people in the complex.

De Leon stated he had problems with De La Garza and had argued with him. Then, at the end of June 2008, De La Garza approached him from behind and claimed De Leon owed him money. When De Leon told him he was wrong, De La Garza threatened to "kick his ass." When De Leon still refused to give him any money, De La Garza attacked him. Arredondo took De Leon to the hospital after the attack. De Leon stated he suffered broken ribs as a result of the attack.

De Leon stated that on the day of the stabbing, he returned to the complex as it was getting dark. Later, as he was walking toward the front of the complex, De La Garza walked up behind him, yelling something about having spent his last $20.00, being paranoid and not enjoying his high, and how someone was going to pay for it. De Leon continued to the front of the complex where Arredondo, Adan, and two others were sitting at the picnic table.

As Arredondo had told the jury earlier, De Leon said De La Garza began to curse at Adan, ordering him to leave. Adan said he was not going to leave, and things seemed to settle down. De Leon testified Arredondo and the others had gone back to their apartments by this time, and he, Adan, and De La Garza were the only people outside by the picnic table. De Leon prepared to return to his apartment, thinking the situation was under control. However, as he started toward the steps, he saw De La Garza hit Adan, causing Adan to fall to the ground. De Leon testified De La Garza was "hovering over [Adan]," and "beating the crap out of him." De Leon stated he told De La Garza to stop, to leave Adan alone. De Leon said he did not want to fight with De La Garza because he was still suffering with three broken ribs from their last encounter. As De La Garza continued to beat and stomp on Adan, De Leon continued to tell De La Garza to leave Adan alone.

De Leon testified he saw De La Garza put his hand in his pocket and pull out a knife. De Leon said he knew De La Garza was going to stab the now unconscious Adan. De Leon claimed that when he warned De La Garza to leave Adan alone, De La Garza turned toward him with the knife in his hand. De Leon described the knife as a pocket knife, and said De La Garza was trying to open it. As De La Garza approached, De Leon said he kicked the knife out of his hand. De La Garza then attacked De Leon and "all hell broke loose."

According to De Leon, De La Garza hit him and then they were "beating the hell out of each other." The fight continued, but at some point De La Garza caught his leg on the picnic table bench and began to fall backwards. As he fell, he grabbed De Leon's hair, pulling him down with him. De Leon testified De La Garza recovered his knife, opened it, and began swinging it. The men struggled to gain control of the knife.

Eventually, De La Garza ended up on top of De Leon. De Leon said De La Garza was "pushing the knife down into me . . . trying to stick me with the knife." De Leon stated he was holding De La Garza's hand in an attempt to prevent the attempted stabbing. They once again began to roll around on the ground, each attempting to get on top of the other and gain control of the knife. De Leon said he was able to force De La Garza to drop the knife, and they both scrambled for it. At this point, De Leon said he told De La Garza over and over to stop, to let it go, but De La Garza would not stop, telling De Leon he was going to kill him.

De Leon testified De La Garza grabbed him by the throat and choked him. De Leon said he could not breathe and he panicked. De Leon then gained control of the knife and in his panic, "started stabbing" De La Garza. De La Garza released De Leon, who tried to get to his feet; however, De La Garza reached up and again grabbed De Leon by the throat, yelling, "You're going to die . . . I'm going to kill you." De Leon stated he was getting dizzy from being choked so he started stabbing De La Garza again until De La Garza let go of his throat.

De Leon told the jury he was trying to stab De La Garza in the arm, but he could not see because his hair was in his face and De La Garza had both hands wrapped around his throat. De Leon said he was scared and he had never done anything like that in his life. De Leon said he tried to help De La Garza up and that he and Adan, who was conscious by now, helped De La

Garza to his feet and started toward the complex. De La Garza said he was going to call the police and pushed them away, walking on his own toward his apartment.

De Leon said Arredondo and another resident came out at that point. De Leon said he asked Arredondo to help him find his phone so he could call 911. They found the phone, but De Leon said he was unable to call 911 because the "phone must have messed up" during the fight. He then told Arredondo to call 911. De Leon said he went back outside and one of the residents commented that he had De La Garza's blood on him and warned him about possible AIDS contamination. De Leon said he panicked because he had scrapes and bites and had De La Garza's "blood all over me." So, he went to his apartment and removed all of his clothes except his boxer shorts. He then went to the common shower area to rinse off the blood. When he heard the police officer asking about him, he answered and came out of the bathroom. De Leon said he had no idea what happened to the bloody clothes he left in his apartment, but denied putting them in the dumpster across the street. In fact, De Leon denied the clothes found in the dumpster were his clothes. He also did not know what happened to the knife; he said he left it with his clothes, which disappeared while he was showering.

De Leon admitted he lied to the police. He told the jury he lied because he was scared. He claimed a detective threatened him with the death penalty. De Leon concluded by telling the jury he did not intend to kill De La Garza. Rather, he was only trying to make him let go of his throat so he could breathe.

On cross-examination, De Leon admitted that his testimony was nothing like the statement he gave police on the night of the stabbing, reiterating that it was because he was scared. On the night of the stabbing, he denied having anything to do with it, telling the detective two other people killed De La Garza, but that he did not know them. The State also

contested the details of De Leon's version of events, pointing out inconsistencies and potential problems.

In rebuttal, the State called Detective Frank Garibay, who interviewed De Leon after he was brought to the police station. Contrary to De Leon's testimony, Detective Garibay testified there were no "visible fresh injuries to his hand, or anything like that." Through the detective, the State introduced and had admitted into evidence a picture of De Leon from that night, as well as a picture of Adan. De Leon did complain about his back and a hernia or stomach problem. The detective stated De Leon did not appear to be scared.

Detective Garibay testified De Leon told him two other individuals killed De La Garza. De Leon told him he believed the killers were with the Mexican Mafia. According to the detective, he brought up the idea of self-defense, not De Leon. Detective Garibay used the concept in an effort to get to the truth, not because he believed De Leon killed De La Garza in self-defense. De Leon "adamantly denied" killing De La Garza in self-defense.

After both sides finished their presentations of the evidence and gave their closing arguments, the matter was submitted to the jury. The court's charge included instructions on the law of self-defense and the use of deadly force to protect oneself and others. After deliberating, the jury found De Leon guilty of murder, rejecting self-defense and defense of others.

In the punishment phase of the trial, the jury charge included a sudden passion instruction, which permitted the jury to find De Leon had committed a second degree felony as opposed to a first degree felony. However, the jury rejected the sudden passion claim and sentenced De Leon to twenty-three years confinement. After he was formally sentenced, De Leon perfected this appeal.

## ANALYSIS

De Leon does not contest that he caused the death of De La Garza.  Rather, De Leon contends the jury's negative answer to the sudden passion issue in the court's punishment charge was against the great weight and preponderance of the evidence, i.e., factually insufficient.  In other words, he contests the jury's failure to find that he caused the death under the immediate influence of sudden passion that arose from an adequate cause.

### *Applicable Law and Standard of Review*

At the punishment phase of a trial, a defendant found guilty of murder may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause.  *See* TEX. PENAL CODE ANN. § 19.02(d) (West 2011).  If the defendant proves the issue by a preponderance of the evidence, the murder is reduced to a second degree felony.  *Id.*  "Sudden passion" means "passion directly caused by and arising out of provocation by the individual killed."  *Id.* § 19.02(a)(2).  "Adequate cause" means "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection."  *Id.* § 19.02(a)(1).

Sudden passion must arise at the time of the offense and cannot result solely from former provocation.  *Hernandez v. State*, 127 S.W.3d 206, 213 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).  Moreover, neither ordinary fear nor anger alone is sufficient to establish sudden passion.  *See id.* 213-14; *see also Naasz v. State*, 974 S.W.2d 418, 425 (Tex. App.—Dallas 1998, pet. ref'd) (holding defendant's testimony of being upset and angry over culmination of events did not rise to level of adequate cause).  A defendant's fear is only sufficient if the cause of the fear could produce fear that rises to a level of terror which makes a person of ordinary temper incapable of cool reflection.  *Daniels v. State*, 645 S.W.2d 459, 460 (Tex. Crim. App. 1983).

Similarly, a defendant may not rely on a cause of his own making to support a claim of sudden passion. *Trevino v. State*, 157 S.W.3d 818, 822 n.4 (Tex. App.—Fort Worth 2005, no pet.) (holding defendant's conduct led complainant to fire gun at him and therefore complainant's conduct did not constitute adequate cause).

When a defendant seeks appellate review of a failure to make a finding on which the defendant has the burden of proof, like sudden passion, we must apply a factual sufficiency standard of review. [3] *Meraz v. State*, 785 S.W.2d 146, 154-55 (Tex. Crim. App. 1990); *see* TEX. PENAL CODE ANN. § 19.02(d) (stating defendant had burden to prove sudden passion by preponderance of evidence). Accordingly, we will review all of the evidence in a neutral light and determine whether the jury's failure to find sudden passion is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000); *Meraz*, 785 S.W.2d at 155. Even though we review the evidence in a neutral light, we must be mindful of the fact that we cannot substitute our judgment for that of the jury, and the jury is the sole judge of the weight and credibility of the witnesses' testimony. *Meraz*, 785 S.W.2d at 154-55; *Cleveland v. State*, 177 S.W.3d 374, 390-91 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd).

---

[3] In its brief, the State suggests we should reject the factual sufficiency standard of review in favor of a pure legal sufficiency review. In support of its suggestion, the State relies on *Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010), a Fifth Circuit case, and three out-of-state cases. The State's reliance on *Brooks* is misplaced. In *Brooks*, the court of criminal appeals held that when the sufficiency of the evidence to support one or more *elements* of an offense is challenged, we may only review such a challenge under the *Jackson v. Virginia* legal sufficiency standard. 323 S.W.3d at 895. Nowhere in *Brooks* did the court suggest that its holding was applicable to sufficiency challenges to issues upon which the defendant has the burden of proof by a preponderance of the evidence, nor did it overrule *Meraz*. Accordingly, we are bound by the court's holding in *Meraz* where the court of criminal appeals specifically held a factual sufficiency review was the proper standard for reviewing challenges to the sufficiency of the evidence relating to issues upon which the defendant has the burden of proof. *See Meraz*, 785 S.W.2d 146, 155 (Tex. Crim. App. 1990). *Meraz* has not been overruled, and therefore, we are bound to follow it. *See Ervin v. State*, 331 S.W.3d 49, 53 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (holding intermediate court of appeals is bound to follow precedent of court of criminal appeals); *see also* TEX. CONST. art. V, § 5(a) (stating court of criminal appeals is final authority for criminal law in Texas).

*Application*

De Leon relies on his own testimony to argue the jury's finding of no sudden passion was against the great weight and preponderance of the evidence. De Leon's testimony was essentially that he acted in defense of Adan and then in self-defense when De La Garza turned on him. De Leon claimed De La Garza was going to stab Adan, who was allegedly unable to defend himself by the time De La Garza went for his pocket knife. According to De Leon, he and De La Garza were alone, except for an unconscious Adan, when the fight began and progressed. De Leon seemed to believe he had no choice but to try to protect Adan and then himself from an out-of-control De La Garza. He testified that his prior encounter with De La Garza made him fearful.

However, De Leon's testimony was contrary to that given by his friend, Arredondo. Arredondo stated he was there when De Leon jumped on De La Garza, specifically testifying that before De Leon attacked De La Garza he stated, "well, now this one is going – is going to pay now. . . . [h]e's a son of a bitch." According to Arredondo, De Leon was referring to De La Garza and their prior altercation. Arredondo stated he did not see either Adan or De La Garza with a knife–only De Leon was armed with what he came to believe was a knife. Arredondo's testimony about the fight and what occurred was completely contrary to that of De Leon. Arredondo's testimony was also contrary to De Leon's claims that he attempted to help De La Garza after stabbing him.

Based on the evidence set forth here and above, we cannot say the jury's finding of no sudden passion is so against the great weight and preponderance of the evidence to be manifestly unjust. The jury was free to disbelieve De Leon's testimony, particularly given his admission that he lied to police, and accept the testimony of Arredondo. *See Trevino*, 157 S.W.3d at 822

(holding jury was free to make its own determination of defendant's credibility and reject his version of events if it did not believe he was telling the truth). The jury could have found De Leon's testimony was merely an attempt to paint himself as a victim rather than a perpetrator out to revenge an earlier attack by De La Garza.

## Conclusion

Based on the foregoing, we hold the evidence was not so against the great weight and preponderance of the evidence as to preclude a finding of no sudden passion. Accordingly, we overrule De Leon's point of error and affirm the trial court's judgment.

Marialyn Barnard, Justice

Publish