02-12-121-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-12-00121-CR

 

 


 
 
 Warren
 Lynn McSpadden
  
  
  
 v.
  
  
  
 The
 State of Texas
 
 
 §
  
 §
  
 §
  
 §
  
 §
 
 
 From the 213th District
 Court
  
 of
 Tarrant County (1222280D)
  
 March
 14, 2013
  
 Per
 Curiam
  
 (nfp)
 
 


 

JUDGMENT

 

          This
court has considered the record on appeal in this case and holds that there was
no error in the trial court’s judgment.  It is ordered that the judgment of the
trial court is affirmed. 

 

SECOND DISTRICT COURT OF APPEALS

 

 

 

PER
CURIAM

 

 

 

 

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

 

NO. 02-12-00121-CR

 

 


 
 
 Warren Lynn McSpadden
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

 

----------

FROM THE 213th
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

          Appellant
Warren Lynn McSpadden appeals his conviction for first-degree-felony murder,
contending in one issue that the trial court should have convicted him only of
second-degree-felony murder because the evidence shows that he caused the
victim’s death under the immediate influence of sudden passion arising from an
adequate cause.  We affirm.

Background Facts

          A
grand jury indicted appellant with committing murder by intentionally or
knowingly causing the death of Gregory Mayfield through shooting him with a firearm. 
Upon receiving admonishments about the effects of pleading guilty and upon waiving
his constitutional and statutory rights, appellant judicially confessed to the
offense and entered an open guilty plea.  The trial court recessed the
proceedings for the preparation of a presentence investigation report.

          Two
months later, the trial court held a punishment hearing.  After the trial court
admitted the presentence investigation report and considered testimony from six
witnesses, the court convicted appellant of first-degree-felony murder and
sentenced him to fifteen years’ confinement.  Appellant brought this appeal.

Appellant’s
Claim of Sudden Passion and Adequate Cause

          In
his only issue, appellant argues that the evidence is insufficient to support the
trial court’s rejection of his claim that he committed the murder under the
immediate influence of sudden passion arising from an adequate cause.  A person
commits murder by intentionally or knowingly causing the death of an
individual.  Tex. Penal Code Ann. § 19.02(b)(1) (West 2011).  Typically, murder
is a first-degree felony.  Id. § 19.02(c).  But at the punishment stage
of a trial, the defendant may “raise the issue as to whether he caused the
death under the immediate influence of sudden passion arising from an adequate
cause.  If the defendant proves the issue in the affirmative by a preponderance
of the evidence, the offense is a felony of the second degree.”  Id. §
19.02(d).[2]

          “Adequate
cause” means a “cause that would commonly produce a degree of anger, rage,
resentment, or terror in a person of ordinary temper, sufficient to render the
mind incapable of cool reflection.”  Id. § 19.02(a)(1).  A defendant
“may not rely on a cause of his own making, such as when he precipitates a
confrontation.”  Wilson v. State, No. 02-04-00151-CR, 2005 WL 2245650,
at *6 (Tex. App.—Fort Worth Sept. 15, 2005, pet. ref’d) (mem. op., not
designated for publication) (citing Naasz v. State, 974 S.W.2d 418, 423
(Tex. App.—Dallas 1998, pet. ref’d)), cert. denied, 549 U.S. 1000 (2006). 
“Sudden passion” means “passion directly caused by and arising out of
provocation by the individual killed or another acting with the person killed
which passion arises at the time of the offense and is not solely the result of
former provocation.”  Tex. Penal Code Ann. § 19.02(a)(2); see also
McKinney v. State, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005) (stating that
a defendant raising sudden passion to mitigate a murder conviction must prove
that there was an adequate provocation, that a “passion or an emotion such as
fear, terror, anger, rage, or resentment existed[;] that the homicide occurred
while the passion still existed and before there was reasonable opportunity for
the passion to cool; and that there was a causal connection between the
provocation, the passion, and the homicide”).

          Citing
Meraz v. State, appellant asks us to review the evidence to determine
whether the trial court’s rejection of his claim of sudden passion and adequate
cause is “so against the great weight and preponderance of the evidence so as
to be manifestly unjust.”  785 S.W.2d 146, 155 (Tex. Crim. App. 1990); see
also Matlock v. State, No. PD-0308-12, 2013 WL 690854, at *4 (Tex. Crim.
App. Feb. 27, 2013) (reiterating that appellate courts must apply the standards
articulated in Meraz to an appellant’s factual sufficiency challenge of
an adverse finding on the appellant’s affirmative defense).  Courts of appeals
have applied the Meraz factual sufficiency standard to a factfinder’s
rejection of a defendant’s claim of sudden passion and adequate cause under
section 19.02(d) of the penal code, and because we construe appellant’s issue
to challenge the factual sufficiency of the trial court’s rejection of that
claim, we will do the same.  See De Leon v. State, 373 S.W.3d 644, 650–51
(Tex. App.—San Antonio 2012, pet. ref’d); Smith v. State, 355 S.W.3d
138, 148–50 (Tex. App.—Houston [1st Dist.] 2011, pet. ref’d).

          In
our review of the factual sufficiency of the evidence supporting the rejection
of appellant’s claim of sudden passion and adequate cause, we may not usurp the
function of the factfinder by substituting our judgment in the place of its judgment. 
See Matlock, 2013 WL 690854, at *4.  We may sustain appellant’s issue only
if, after viewing the evidence in a neutral light, detailing the relevant
evidence, and stating in what regard the contrary evidence greatly outweighs
the evidence supporting the judgment, we also clearly state why the judgment is
so against the great weight of the evidence as to be manifestly unjust, why it
shocks the conscience, or why it clearly demonstrates bias.  See id. at
*4; De Leon, 373 S.W.3d at 651.

          The
trial court received the following evidence through the presentence
investigation report.  Appellant, who was born in 1935, met Kim Alvarado in
2000 when he “pick[ed] her up . . . for sex.”  Appellant married Alvarado in 2001
or 2002, but they stayed married for only a few months; he divorced her because
he “found out how sorry she was.”  Alvarado later met Mayfield, the victim,
while they were in “drug meetings” together.  She began staying with Mayfield
in October 2010 although she was married to another man at that time.

          In
November 2010, Mayfield and Alvarado drove to appellant’s house so that,
according to Mayfield, he could pay a debt that he owed to appellant.  Alvarado
later learned that Mayfield was taking fake money to appellant’s house.  Before
Mayfield and Alvarado arrived at the house, they got into an argument.  When
they arrived there, Alvarado walked away because she “didn’t want anything to
do with what [Mayfield] was trying to do.”  Mayfield went to appellant’s door,
but appellant told Mayfield to leave him alone, and appellant shut the door.

          Eventually,
Alvarado walked back to appellant’s house, but Mayfield had driven away. 
Alvarado told appellant that she and Mayfield had gotten into a fight.  Appellant
asked Alvarado where her belongings were, and she told him that they were at
Mayfield’s house.  When Alvarado and appellant called Mayfield, he told them
that he would allow Alvarado to retrieve her possessions from his house if appellant
paid him $100.  Although appellant “didn’t want to give [Mayfield] the money,” he
drove Alvarado to Mayfield’s house.  On the way there, appellant, who was
becoming angry, called Mayfield and “told him to let [Alvarado] have her
medicine.”  Also on the way to Mayfield’s house, Alvarado told appellant that
“if anything, . . . [they] could call the [police] . . . if [they] needed
help.”

          When
appellant and Alvarado arrived at Mayfield’s house, according to Alvarado, Mayfield
said that for $60, he would let Alvarado in the house.  Appellant gave Alvarado
$59 and drove away.[3]  But when Alvarado took
the money to Mayfield, he said that he wanted $100, and he shut the door.

          About
three hours later, Mayfield called appellant to state that he would not let
Alvarado into the house unless appellant gave him $100.  Although appellant
told Mayfield that he “didn’t want to get involved,” Mayfield and Alvarado
drove back to appellant’s house.

          According
to appellant, when Mayfield and Alvarado arrived at his house for the second
time that day, Alvarado came to the door, and while crying, she told appellant
that Mayfield would not let her have her medicine.  Appellant became angrier,
got a shotgun from under his bed,[4] went out of his front
door to Mayfield’s car, and from about three feet away, shot Mayfield twice
while Mayfield was sitting in the front seat of the car.

          According
to Alvarado’s statement to the police, however, Mayfield had said that appellant
had agreed to give Mayfield $40 more so that Alvarado could get into Mayfield’s
house.  Thus, according to Alvarado, when she and Mayfield arrived at
appellant’s house, she went to appellant’s door and thanked him for helping her
get back into Mayfield’s house.  Appellant, however, went to his bedroom,
grabbed the shotgun, went out of the door of the house, shot Mayfield once,
cursed at him, and then shot him again.

          Appellant
called 911 to inform the police that he had shot Mayfield.  When the police
arrived, appellant stated, “I shot [Mayfield] because he was harassing me, and
he wouldn’t leave me alone.”  The police found Mayfield in his car; he had
gunshot wounds on his upper right arm and on his midsection.  They also found
Alvarado sitting inside appellant’s house; like appellant, she told the police
that appellant shot Mayfield because Mayfield would not stop harassing
appellant.  Appellant told the police that the shotgun that he had used to kill
Mayfield was under his bed, and the police found the gun.  The police took
appellant to a patrol car, and appellant expressed, “I hoped the son of a bitch
was dead!  I shot him because he wouldn’t stop harassing me and asking me for
money.  I know I’m in trouble.”  Appellant never told the police on the day of
the offense that he was in fear of any threat made by Mayfield.

           Appellant
conveyed in the presentence investigation report that Mayfield had made
hundreds of threatening phone calls to him and had caused hundreds of dollars
in damage to cars that appellant had owned.  Appellant said that Alvarado was a
chronic drug user and had threatened him in the past to get money to buy drugs,
but he said that he nonetheless considered himself to be a father figure to
her.[5] 
Appellant expressed remorse for killing Mayfield, but he later reiterated that
he had lived in fear of Mayfield for several years and that Mayfield had once
threatened to burn down appellant’s house.  Appellant stated that on the day of
the murder, he was “out of [his] mind angry” and that he “knew if [Mayfield]
lived he would do [appellant] damage,” so after shooting Mayfield first in the
arm, he reloaded the gun and shot Mayfield again in the stomach.

          At
appellant’s punishment hearing, witnesses who lived in his neighborhood
testified that he had a good reputation for being peaceful and following the
law, even considering the fact that he killed Mayfield.  Witnesses also
testified that his murder of Mayfield was out of character and that they had
never seen him act violently toward anyone else.[6]  One witness stated that
before the murder, appellant had feared that Mayfield was going to burn his
house down.

          Viewing
these facts in a neutral light, we cannot conclude that the trial court’s
findings against sudden passion and adequate cause were so against the great
weight and preponderance of the evidence as to be manifestly unjust.  See Meraz,
785 S.W.2d at 155.  The trial court could have reasonably concluded that
appellant’s professed reason for killing Mayfield on the date of the shooting—that
Mayfield was “harassing” appellant and would not “leave [appellant] alone”—was
not adequate cause for the shooting because it would not commonly produce “a
degree of anger, rage, resentment, or terror in a person of ordinary temper,
sufficient to render the mind incapable of cool reflection.”  See Tex.
Penal Code Ann. § 19.02(a)(1).  This is particularly true when considering that
although there is evidence that Mayfield had threatened appellant in the past,
there is no evidence that a threat occurred on the date of the murder. 
Appellant’s statements on that day indicate that he was mostly considering
Mayfield’s harassment, rather than Mayfield’s threats, when the shooting
occurred.  Moreover, the evidence shows that appellant was capable of cool
reflection toward Mayfield, by simply telling Mayfield to leave him alone and
by shutting his door in Mayfield’s face, just a few hours before appellant
killed Mayfield.  Finally, although appellant contends that “withholding
medication . . . would provoke a reasonable person” to commit murder, the
record does not disclose what kind of medication Alvarado took or whether there
was an emergent need for her to take it.  And in any event, Alvarado had indicated
to appellant that she could get the medication by calling the police.

          Also,
some evidence could support a conclusion that appellant’s act of killing
Mayfield was based on deliberation rather than sudden passion.  See id. § 19.02(a)(2);
Perez v. State, 940 S.W.2d 820, 823 (Tex. App.—Waco 1997, no pet.) (“Evidence
of the accused’s fear alone does not present the evidence necessary to submit
an issue on sudden passion.  The evidence must go farther and show that his
fear rendered him incapable of deliberate reflection when he shot the victim.”)
(citation omitted).  The presentence investigation report conveys appellant’s
statement that after he shot Mayfield once, he shot him a second time because
he knew that if Mayfield lived, he would harm appellant.  Furthermore, as
evidence weighing against sudden passion, the trial court could have considered
that appellant walked to his bedroom, retrieved the shotgun, opened his front
door, and walked to Mayfield’s car before shooting him.

          For
these reasons, although some evidence exists that a factfinder could have
weighed in favor of findings of sudden passion and of adequate cause, we hold
that the trial court’s findings against appellant on those issues were not so
against the great weight and preponderance of the evidence as to be manifestly
unjust.  Thus, we conclude that the trial court’s findings against appellant on
sudden passion and adequate cause were based on factually sufficient evidence,
and we overrule appellant’s only issue.  See Meraz, 785 S.W.2d at 155.

Conclusion

          Having
overruled appellant’s only issue, we affirm the trial court’s judgment.

 

 

PER CURIAM

 

PANEL: 
LIVINGSTON,
C.J.; MEIER and GABRIEL, JJ.

 

DO
NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED:  March 14, 2013









[1]See Tex. R. App. P. 47.4.





[2]We note that appellant’s
fifteen-year sentence falls within the range of either a first-degree felony or
a second-degree felony.  See Tex. Penal Code Ann. §§ 12.32(a),
.33(a) (West 2011).





[3]Appellant told the police
that he gave the $59 to Alvarado because she had said that she “knew how to
handle” Mayfield by taking him out to eat.





[4]Appellant had purchased
the shotgun in 1959 for hunting and later kept it for protection.





[5]Appellant described
Mayfield and Alvarado together as “a lot worse than Bonnie & Clyde . . . in
the 1930s.”  Appellant explained that he began giving money to Mayfield and
Alvarado in 2003 and that he was afraid to report them to the police.  In 2006,
however, appellant filed a police report concerning Mayfield’s harassment of
him.





[6]Appellant’s presentence
investigation revealed that he had been arrested only one other time, in 1958,
for trespassing.