

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-12-00121-CR

| | | |
|---|---|---|
| Warren Lynn McSpadden | § | From the 213th District Court |
| | § | of Tarrant County (1222280D) |
| v. | § | March 14, 2013 |
| | § | Per Curiam |
| The State of Texas | § | (nfp) |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's judgment. It is ordered that the judgment of the trial court is affirmed.

SECOND DISTRICT COURT OF APPEALS

PER CURIAM



# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00121-CR

WARREN LYNN MCSPADDEN                                    APPELLANT

V.

THE STATE OF TEXAS                                              STATE

----------

### FROM THE 213TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant Warren Lynn McSpadden appeals his conviction for first-degree-felony murder, contending in one issue that the trial court should have convicted him only of second-degree-felony murder because the evidence shows that he caused the victim's death under the immediate influence of sudden passion arising from an adequate cause. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

**Background Facts**

A grand jury indicted appellant with committing murder by intentionally or knowingly causing the death of Gregory Mayfield through shooting him with a firearm. Upon receiving admonishments about the effects of pleading guilty and upon waiving his constitutional and statutory rights, appellant judicially confessed to the offense and entered an open guilty plea. The trial court recessed the proceedings for the preparation of a presentence investigation report.

Two months later, the trial court held a punishment hearing. After the trial court admitted the presentence investigation report and considered testimony from six witnesses, the court convicted appellant of first-degree-felony murder and sentenced him to fifteen years' confinement. Appellant brought this appeal.

**Appellant's Claim of Sudden Passion and Adequate Cause**

In his only issue, appellant argues that the evidence is insufficient to support the trial court's rejection of his claim that he committed the murder under the immediate influence of sudden passion arising from an adequate cause. A person commits murder by intentionally or knowingly causing the death of an individual. Tex. Penal Code Ann. § 19.02(b)(1) (West 2011). Typically, murder is a first-degree felony. *Id.* § 19.02(c). But at the punishment stage of a trial, the defendant may "raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause. If the

2

defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree." *Id.* § 19.02(d).[2]

"Adequate cause" means a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1). A defendant "may not rely on a cause of his own making, such as when he precipitates a confrontation." *Wilson v. State*, No. 02-04-00151-CR, 2005 WL 2245650, at *6 (Tex. App.—Fort Worth Sept. 15, 2005, pet. ref'd) (mem. op., not designated for publication) (citing *Naasz v. State*, 974 S.W.2d 418, 423 (Tex. App.—Dallas 1998, pet. ref'd)), *cert. denied*, 549 U.S. 1000 (2006). "Sudden passion" means "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." Tex. Penal Code Ann. § 19.02(a)(2); *see also McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005) (stating that a defendant raising sudden passion to mitigate a murder conviction must prove that there was an adequate provocation, that a "passion or an emotion such as fear, terror, anger, rage, or resentment existed[;] that the homicide occurred while the passion still existed and before there was

---

[2]We note that appellant's fifteen-year sentence falls within the range of either a first-degree felony or a second-degree felony. *See* Tex. Penal Code Ann. §§ 12.32(a), .33(a) (West 2011).

reasonable opportunity for the passion to cool; and that there was a causal connection between the provocation, the passion, and the homicide").

Citing *Meraz v. State*, appellant asks us to review the evidence to determine whether the trial court's rejection of his claim of sudden passion and adequate cause is "so against the great weight and preponderance of the evidence so as to be manifestly unjust." 785 S.W.2d 146, 155 (Tex. Crim. App. 1990); *see also Matlock v. State*, No. PD-0308-12, 2013 WL 690854, at *4 (Tex. Crim. App. Feb. 27, 2013) (reiterating that appellate courts must apply the standards articulated in *Meraz* to an appellant's factual sufficiency challenge of an adverse finding on the appellant's affirmative defense). Courts of appeals have applied the *Meraz* factual sufficiency standard to a factfinder's rejection of a defendant's claim of sudden passion and adequate cause under section 19.02(d) of the penal code, and because we construe appellant's issue to challenge the factual sufficiency of the trial court's rejection of that claim, we will do the same. *See De Leon v. State*, 373 S.W.3d 644, 650–51 (Tex. App.—San Antonio 2012, pet. ref'd); *Smith v. State*, 355 S.W.3d 138, 148–50 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd).

In our review of the factual sufficiency of the evidence supporting the rejection of appellant's claim of sudden passion and adequate cause, we may not usurp the function of the factfinder by substituting our judgment in the place of its judgment. *See Matlock*, 2013 WL 690854, at *4. We may sustain appellant's issue only if, after viewing the evidence in a neutral light, detailing the relevant

4

evidence, and stating in what regard the contrary evidence greatly outweighs the evidence supporting the judgment, we also clearly state why the judgment is so against the great weight of the evidence as to be manifestly unjust, why it shocks the conscience, or why it clearly demonstrates bias. *See id.* at *4; *De Leon*, 373 S.W.3d at 651.

The trial court received the following evidence through the presentence investigation report. Appellant, who was born in 1935, met Kim Alvarado in 2000 when he "pick[ed] her up . . . for sex." Appellant married Alvarado in 2001 or 2002, but they stayed married for only a few months; he divorced her because he "found out how sorry she was." Alvarado later met Mayfield, the victim, while they were in "drug meetings" together. She began staying with Mayfield in October 2010 although she was married to another man at that time.

In November 2010, Mayfield and Alvarado drove to appellant's house so that, according to Mayfield, he could pay a debt that he owed to appellant. Alvarado later learned that Mayfield was taking fake money to appellant's house. Before Mayfield and Alvarado arrived at the house, they got into an argument. When they arrived there, Alvarado walked away because she "didn't want anything to do with what [Mayfield] was trying to do." Mayfield went to appellant's door, but appellant told Mayfield to leave him alone, and appellant shut the door.

Eventually, Alvarado walked back to appellant's house, but Mayfield had driven away. Alvarado told appellant that she and Mayfield had gotten into a

5

fight. Appellant asked Alvarado where her belongings were, and she told him that they were at Mayfield's house. When Alvarado and appellant called Mayfield, he told them that he would allow Alvarado to retrieve her possessions from his house if appellant paid him $100. Although appellant "didn't want to give [Mayfield] the money," he drove Alvarado to Mayfield's house. On the way there, appellant, who was becoming angry, called Mayfield and "told him to let [Alvarado] have her medicine." Also on the way to Mayfield's house, Alvarado told appellant that "if anything, . . . [they] could call the [police] . . . if [they] needed help."

When appellant and Alvarado arrived at Mayfield's house, according to Alvarado, Mayfield said that for $60, he would let Alvarado in the house. Appellant gave Alvarado $59 and drove away.[3] But when Alvarado took the money to Mayfield, he said that he wanted $100, and he shut the door.

About three hours later, Mayfield called appellant to state that he would not let Alvarado into the house unless appellant gave him $100. Although appellant told Mayfield that he "didn't want to get involved," Mayfield and Alvarado drove back to appellant's house.

According to appellant, when Mayfield and Alvarado arrived at his house for the second time that day, Alvarado came to the door, and while crying, she told appellant that Mayfield would not let her have her medicine. Appellant

---

[3]Appellant told the police that he gave the $59 to Alvarado because she had said that she "knew how to handle" Mayfield by taking him out to eat.

6

became angrier, got a shotgun from under his bed,[4] went out of his front door to Mayfield's car, and from about three feet away, shot Mayfield twice while Mayfield was sitting in the front seat of the car.

According to Alvarado's statement to the police, however, Mayfield had said that appellant had agreed to give Mayfield $40 more so that Alvarado could get into Mayfield's house. Thus, according to Alvarado, when she and Mayfield arrived at appellant's house, she went to appellant's door and thanked him for helping her get back into Mayfield's house. Appellant, however, went to his bedroom, grabbed the shotgun, went out of the door of the house, shot Mayfield once, cursed at him, and then shot him again.

Appellant called 911 to inform the police that he had shot Mayfield. When the police arrived, appellant stated, "I shot [Mayfield] because he was harassing me, and he wouldn't leave me alone." The police found Mayfield in his car; he had gunshot wounds on his upper right arm and on his midsection. They also found Alvarado sitting inside appellant's house; like appellant, she told the police that appellant shot Mayfield because Mayfield would not stop harassing appellant. Appellant told the police that the shotgun that he had used to kill Mayfield was under his bed, and the police found the gun. The police took appellant to a patrol car, and appellant expressed, "I hoped the son of a bitch was dead! I shot him because he wouldn't stop harassing me and asking me for

_____

[4]Appellant had purchased the shotgun in 1959 for hunting and later kept it for protection.

money. I know I'm in trouble." Appellant never told the police on the day of the offense that he was in fear of any threat made by Mayfield.

Appellant conveyed in the presentence investigation report that Mayfield had made hundreds of threatening phone calls to him and had caused hundreds of dollars in damage to cars that appellant had owned. Appellant said that Alvarado was a chronic drug user and had threatened him in the past to get money to buy drugs, but he said that he nonetheless considered himself to be a father figure to her.[5] Appellant expressed remorse for killing Mayfield, but he later reiterated that he had lived in fear of Mayfield for several years and that Mayfield had once threatened to burn down appellant's house. Appellant stated that on the day of the murder, he was "out of [his] mind angry" and that he "knew if [Mayfield] lived he would do [appellant] damage," so after shooting Mayfield first in the arm, he reloaded the gun and shot Mayfield again in the stomach.

At appellant's punishment hearing, witnesses who lived in his neighborhood testified that he had a good reputation for being peaceful and following the law, even considering the fact that he killed Mayfield. Witnesses also testified that his murder of Mayfield was out of character and that they had

---

[5]Appellant described Mayfield and Alvarado together as "a lot worse than Bonnie & Clyde . . . in the 1930s." Appellant explained that he began giving money to Mayfield and Alvarado in 2003 and that he was afraid to report them to the police. In 2006, however, appellant filed a police report concerning Mayfield's harassment of him.

never seen him act violently toward anyone else.[6]   One witness stated that before the murder, appellant had feared that Mayfield was going to burn his house down.

Viewing these facts in a neutral light, we cannot conclude that the trial court's findings against sudden passion and adequate cause were so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Meraz*, 785 S.W.2d at 155.  The trial court could have reasonably concluded that appellant's professed reason for killing Mayfield on the date of the shooting—that Mayfield was "harassing" appellant and would not "leave [appellant] alone"—was not adequate cause for the shooting because it would not commonly produce "a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *See* Tex. Penal Code Ann. § 19.02(a)(1).  This is particularly true when considering that although there is evidence that Mayfield had threatened appellant in the past, there is no evidence that a threat occurred on the date of the murder.  Appellant's statements on that day indicate that he was mostly considering Mayfield's harassment, rather than Mayfield's threats, when the shooting occurred.  Moreover, the evidence shows that appellant was capable of cool reflection toward Mayfield, by simply telling Mayfield to leave him alone and by shutting his door in Mayfield's face, just a few hours before appellant killed

---

[6]Appellant's presentence investigation revealed that he had been arrested only one other time, in 1958, for trespassing.

9

Mayfield. Finally, although appellant contends that "withholding medication . . . would provoke a reasonable person" to commit murder, the record does not disclose what kind of medication Alvarado took or whether there was an emergent need for her to take it. And in any event, Alvarado had indicated to appellant that she could get the medication by calling the police.

Also, some evidence could support a conclusion that appellant's act of killing Mayfield was based on deliberation rather than sudden passion. *See id.* § 19.02(a)(2); *Perez v. State*, 940 S.W.2d 820, 823 (Tex. App.—Waco 1997, no pet.) ("Evidence of the accused's fear alone does not present the evidence necessary to submit an issue on sudden passion. The evidence must go farther and show that his fear rendered him incapable of deliberate reflection when he shot the victim.") (citation omitted). The presentence investigation report conveys appellant's statement that after he shot Mayfield once, he shot him a second time because he knew that if Mayfield lived, he would harm appellant. Furthermore, as evidence weighing against sudden passion, the trial court could have considered that appellant walked to his bedroom, retrieved the shotgun, opened his front door, and walked to Mayfield's car before shooting him.

For these reasons, although some evidence exists that a factfinder could have weighed in favor of findings of sudden passion and of adequate cause, we hold that the trial court's findings against appellant on those issues were not so against the great weight and preponderance of the evidence as to be manifestly unjust. Thus, we conclude that the trial court's findings against appellant on

10

sudden passion and adequate cause were based on factually sufficient evidence, and we overrule appellant's only issue.  *See Meraz*, 785 S.W.2d at 155.

## Conclusion

Having overruled appellant's only issue, we affirm the trial court's judgment.


PER CURIAM

PANEL:  LIVINGSTON, C.J.; MEIER and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  March 14, 2013

11