**Affirmed as Modified; Opinion Filed July 27, 2017.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-16-00947-CR

**STEVEN CRAIG DEBUSK, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 3**
**Dallas County, Texas**
**Trial Court Cause No. F-1524552-J**

## MEMORANDUM OPINION

Before Justices Fillmore, Whitehill, and Boatright
Opinion by Justice Fillmore

Appellant Steven Craig DeBusk was indicted for the offense of murder with use of a deadly weapon. Appellant entered an open plea of guilty to murder as charged in the indictment. The trial court assessed punishment of fifty years' imprisonment. In five issues, appellant contends there is legally and factually insufficient evidence to support the trial court's implied rejection of his claim that he acted under the immediate influence of sudden passion when he killed his father; the trial court erred by not finding him guilty of the lesser-included offense of manslaughter because there was insufficient evidence he intentionally or knowingly caused the death of his father; the trial court abused its discretion by sentencing him to fifty years' imprisonment because that punishment violates the objectives of the system of prohibitions, penalties, and correctional measures in the penal code with respect to rehabilitation and

prevention of recurrence; and the trial court's judgment should be reformed to reflect there was no plea agreement in this case. We modify the trial court's judgment to show the term of Appellant's plea bargain was "open," and we affirm the judgment as modified.

## Procedural Background

By indictment, appellant was charged with the September 11, 2015 murder of his father, Ron DeBusk.[1] Appellant judicially confessed to the charged offense and entered an open plea of guilty. After hearing the evidence and arguments at the punishment phase of trial, the trial court sentenced appellant to fifty years' imprisonment. The trial court's judgment includes an affirmative deadly weapon finding. This appeal ensued.

## Factual Summary[2]

Appellant lived with his father, Ron. Sarita Chancey is married to appellant's nephew, Michael Chancey. Sarita and Michael moved in with Ron a couple of months before Ron was killed. According to Sarita's testimony, Michael and appellant got along well when Sarita and Michael moved in. However, in the second month of living with Ron, appellant would get into arguments with his girlfriend, Misty Reiser, and it would "overflow" to Sarita and Michael. Sarita described appellant as a very angry and violent person, and she stated appellant would react loudly and violently at times and would make a spectacle of himself, even in public. Thursday nights were family nights out and they would go to Twin Peaks restaurant in Mesquite, Texas. Sarita and Michael stopped attending the family night out gatherings at the restaurant because they were embarrassed by appellant's behavior. Appellant argued loudly with both Reiser and Ron. Ron did not like the way appellant treated Reiser and, as a result of inappropriate things appellant said to Reiser in public, Ron would "get on" appellant and an

---

[1] Individuals who have the same surnames are referred to in this opinion by their first names.

[2] This factual summary is derived from testimony and evidence admitted at the punishment phase of trial.

argument would ensue. Sarita indicated the arguments were always appellant's fault and Ron would remain calm and collected because he did not like "drama" or making a spectacle. As to the arguments in public and at home between appellant and Ron that she witnessed, Ron would "just sit there" while appellant would jump up and down and yell. After an argument in public, the matter would typically "boil over" at home, resulting in argument, and sometimes physical altercation, between appellant and Michael. One physical altercation between appellant and Michael resulted in bruises from shoulder to shoulder on Michael's chest. About a week before Ron was killed, Sarita and Michael suddenly moved out of Ron's home because the violence was escalating, and they made it clear to Ron they were moving out because of appellant's behavior toward Michael. When they learned Ron had been killed, Sarita sent a text message to appellant asking what he had done and appellant responded "threateningly," indicating he was not afraid to do to Sarita what he had done to Ron. Appellant had indicated to Sarita that there had been a "long history" between him and Ron, including violence between them dating as far back as appellant's youth. Sarita testified one can never tell when appellant is telling the truth.

Michael testified Ron was a peaceful man. Michael understood Ron had a "rough" past, including alcohol consumption, but Michael had never seen Ron drink alcohol. While he and Sarita were living in Ron's home, appellant began to act at times with extreme violence and aggression. Appellant and Reiser's arguments would "boil over" to anyone in the house. Appellant "pushed his weight around" and did what he wanted regardless of what others thought was right or wrong. Michael remembered three physical altercations with appellant, one in which appellant slammed a door on Michael's foot. If Ron thought appellant had stepped out of line, he would tell him so, resulting in appellant becoming angry and claiming Ron loved appellant's half-brother, Sean DeBusk, more than he loved appellant. Ron and appellant got along well until appellant got angry. Michael testified concerning appellant's inappropriate

–3–

behavior at the Twin Peaks restaurant. According to Michael, after they had eaten at Twin Peaks, "there was going to be a fight," and Michael and Sarita stopped going to Twin Peaks for that reason. Michael stated that by the time he and Sarita moved out of Ron's house, he feared for his life. Michael described appellant as a bad person with anger issues.

Sean testified he was aware appellant was living with Ron during a "rough spot" following appellant's divorce. At one point Ron had a drinking problem, but he had not consumed alcohol in seventeen years. Ron smoked marijuana, and Sean thought appellant also smoked marijuana. Sean, fifteen years younger than appellant, could not testify about Ron's behavior before he was born, but believed it is possible appellant saw a different side of Ron. Ron, who was sixty-five years old at the time of his death, weighed 130 pounds and was weak. Ron could not ride his motorcycle any longer because he could barely hold it upright. Ron had chronic obstructive pulmonary disease (COPD), took medication, and used breathing machines, inhalers, and humidifiers in his home. Forty-two year old appellant was "twice" Ron's size. With regard to this incident, Sean received a message that appellant and Ron had gotten into a fight, and Sean began telephoning hospitals to try to locate Ron, eventually phoning the police and learning Ron was deceased.

Kendall DeBusk testified she married appellant in May 2010 and last saw him in December 2014. When she met appellant in 2007, he was nice. He had a grudge against Ron because Ron physically abused him when he was a child and because Ron left his family and had another son, Sean. Appellant was jealous of Sean. Kendall testified Ron was very nice to appellant. Appellant went to a counselor who prescribed medications for depression and nightmares, and Kendall saw an improvement in appellant when he took the medications. He only took the prescribed medications for a couple of months because they made him sleepy. When appellant did not take the medications, he had "issues" with his moods and anger. When

–4–

he was not drinking alcohol and was not angry, Kendall described appellant as a great man. Kendall described an incident in 2009 when they were visiting her family. Appellant was arguing with his family on the telephone and Kendall told him to ignore them. He shoved Kendall face down into a rock porch. The next morning he told her he was sorry and was going to quit drinking alcohol and work on his anger. Appellant stopped drinking alcohol from 2009 to 2011, but Kendall testified she never "really saw him work on his anger." Kendall also testified regarding an incident in 2012 in which appellant threw her into a filing cabinet, threw a vacuum cleaner at her, and, with a .357 gun in his hand, said "homicide or suicide" to her as she tried to leave. He explained to Kendall that "homicide or suicide" was the only way out of their relationship.

Willie Smith, appellant's co-worker, testified he had dinner with appellant and Ron at the Twin Peaks restaurant the night Ron died. When appellant received a telephone call during dinner, he left the table and went outside for twenty to thirty minutes. When he returned to the table, Ron was upset that appellant had left the table and chastised him for being rude, saying, "this how you going to do your friend and your dad, just get up and leave like this." Smith testified Ron did not speak to appellant in an aggressive way. Appellant leaned over and whispered something to Ron in an aggressive manner. Ron did not finish his meal; he remained at the table for about five minutes and then left. Appellant stayed at the table for another ten to fifteen minutes and finished the beer he was drinking. Smith thought he and appellant drank another beer after going outside. Appellant asked Smith if he wanted to go back to Ron's house and finish "that 18-pack" of beer, but Smith declined. Smith and appellant left the Twin Peaks restaurant approximately thirty minutes after Ron had departed.

Jason Rogers testified that the night Ron died, he arrived at the Twin Peaks restaurant and saw appellant and Ron arguing in the parking lot. While both men were angry and yelling at

each other, Rogers stated the altercation appeared one-sided in that appellant was pushing Ron but Ron was not pushing back. Rogers felt obligated to step in and break up the argument because Ron was gray-haired and elderly. Appellant "turned on" Rogers and told Rogers he was an ex-Marine and used to kill people. Ron went to his vehicle and left Twin Peaks. Rogers stood outside Twin Peaks with appellant for ten to fifteen minutes while appellant smoked a cigarette. Appellant was "heated up" and Rogers tried to calm him down. Appellant said he "kept messing up in life," and he thought Ron was mad at him. Rogers remembered appellant leaving the parking lot "pretty darn aggressively" on his motorcycle and riding by Twin Peaks on the service road at a "pretty high" rate of speed.

Reiser testified she began dating appellant in April 2015. Appellant was in his forty's and Ron was about sixty-five years old when he died. The night Ron died, Reiser was at her own home. She had telephoned appellant during his dinner with Ron and had spoken with him for about thirty minutes. The last time she spoke to appellant that evening was about 8:30 p.m. Reiser's cell phone indicated appellant sent her a text message before he called 9-1-1 the night Ron died, but she did not see the text message that night. At 6:00 a.m. the following morning, appellant was sitting outside Reiser's home, and he was upset and crying. Appellant said he and Ron "got into it" the night before and he "didn't quite remember" what happened. He remembered Ron hitting him, and the last thing he remembered was grabbing Ron's hand. Appellant asked Reiser to help him find Ron, and they began contacting hospitals. About noon, appellant's cousin phoned and said appellant needed to contact the police because Ron had died. On at least one occasion since Ron's death, appellant told Reiser that he knew something was going to happen the night Ron died and he knew he should not go to Ron's home. Appellant told Reiser he knew Ron was upset with him and he had tried to go to another friend's home after leaving the Twin Peaks restaurant.

According to Reiser, appellant had spoken to her about his relationship with Ron. Appellant told Reiser that he had been beaten by Ron when he was young, and that he had been sexually assaulted when he was twelve or thirteen years old. Reiser had seen Ron hit appellant on the back of the head if appellant said or did something Ron did not like or when Ron became frustrated with appellant. Ron would "holler and get onto" appellant or tell appellant he was disrespectful. Ron slapping appellant on the back of the head was belittling to appellant and made him upset. Appellant wanted a close relationship with Ron and wanted Ron to be proud of him. Appellant wanted the type of relationship with Ron that he thought Ron had with Sean. Appellant harbored a fair amount of resentment toward Sean and had told Reiser that Sean was trying to "drain things" from Ron. Appellant told Reiser that if Sean did not give him his "stuff" back, he was going to his home and hurt him. When Michael and Sarita moved into Ron's house, there was increasing tension. Ron was afraid Michael was stealing money and marijuana and asked appellant to kick Michael and Sarita out of the house, but appellant would not do so, which caused tension.

While in jail after Ron's death, appellant asked Reiser if she remembered when "he almost went to prison for hurting those cops." He also spoke to her about an incident when he attempted to kill a man who was trying to break into his house and that it took "six big guys" to pull him off of the man. Appellant also told Reiser that if Michael "touches another [profanity] thing, I'm going to kill him," and "if Michael takes another thing, I'll have two of these charges." While in jail, appellant talked to Reiser about the "horrible things"—killing people— he had to do in Iraq and Afghanistan while in the military. Reiser told a detective investigating Ron's death that appellant suffered from post-traumatic stress disorder as a result of his combat duty.

Shonda Chancey, appellant's older sister, testified appellant loved Ron very much, and appellant missed Ron after Ron left the family when appellant was seven years old. Shonda recounted an incident when appellant was six years old; she could hear appellant screaming while Ron hit him, leaving appellant with belt marks "from his head to his toes." She also testified appellant had been sexually assaulted by a family member when he was young. According to Shonda, Ron did not believe appellant's allegation of sexual assault and told appellant never to mention the subject again.

Appellant's mother, Jeanette Humiston, was married to Ron for 10 years. According to Humiston, appellant was six years old when Ron left their home. Humiston recalled an incident in which Ron locked the rest of the family out of a bedroom and beat appellant. Appellant called Ron on his fourteenth birthday because Ron had told him he could live with Ron when he turned fourteen. However, Ron told appellant it was "not a good time," and that he should call him when he was eighteen years old. Humiston testified appellant received counseling to deal with his depression and suicidal ideations that resulted from the sexual assault by a family member. Appellant moved out of Humiston's home at the age of twenty or twenty-one when he married. Humiston testified "much of" appellant's problems stem from his use of methamphetamine.

With regard to Ron's death, Humiston testified appellant called her at about 1:30 a.m. and was hysterical, saying he and Ron had gotten into an argument and then a fight and he thought he "hurt [Ron] bad." Appellant hold Humiston he did not really know what happened after they got into a fight. He said he went into a rage, "I guess I did, I don't know," and when he realized what he had done, he was shocked and had to leave and try to deal with it. Appellant said he had called Reiser but could not reach her; he phoned 9-1-1 before leaving Ron's home. Appellant said he did not deserve to live for what he did, and he never meant to kill Ron.

Dallas County medical examiner Reade Quinton, M.D., testified regarding the results of Ron's autopsy and autopsy photographs admitted into evidence. Sixty-five year old Ron, a relatively small male, was five and a half feet tall and weighed 129 pounds. He suffered from COPD. Ron's blood tested positive for marijuana, and Quinton testified Ron had ingested marijuana soon before his death. In Quinton's opinion, the cause of Ron's death was blunt force injuries, with COPD contributing to the cause of death. The manner of Ron's death was classified as homicide. Quinton noted extensive external injuries on multiple parts of Ron's body, including blunt force injuries to the upper and lower extremities and lacerations of fingers. Quinton testified the lacerations of fingers and injuries to the forearm are often defensive wounds. Quinton also described contusions, abrasions and lacerations of the face, sides of the head and scalp; bruising or abrasions of the center and sides of the chest and upper shoulder regions of the back; abrasions of the back and posterior right side of the neck; lacerations of the lips, the inside of the lips and cheeks, and contusions of the tongue; several contusions under the scalp, including contusions of the left and right muscles on the side of the head; and an area of subarachnoid hemorrhage on the left side of the brain. Quinton testified there was hemorrhaging of the left eye, which is commonly associated with strangulation but can also result from blunt force trauma. The sternum and ribs on the left and right were fractured, with more extensive fracturing on the left side where ribs three through ten were fractured. There were also a few posterior rib fractures where the ribs meet the spine. Quinton testified the rib fractures were important in considering the cause of Ron's death because the displaced ribs resulted in contusions and lacerations of the left lung and bleeding in the chest cavity, which made breathing more difficult for Ron who already had difficulty breathing as a result of COPD. Quinton opined that conservatively Ron sustained ten to fifteen impacts to the head and neck area. Ron may

–9–

have been rendered unconscious as a result of the subarachnoid hemorrhage, but may have remained conscious and lived for some period of time after the injuries he sustained.

Garland Police Department forensic investigator Marlo Beach testified regarding the crime scene and photographs of the crime scene admitted into evidence. Ron's body was lying behind a couch in a hallway. Photographs of the scene show broken glass near Ron's feet and broken glass in a picture frame on a nearby wall. Ron's bedroom was in disarray with bloodstains on the wall. A four-post wooden bed frame that appeared to be of sturdy construction was damaged and there was blood on multiple locations on the bed. There was damage to the bedroom door and in the walk-in closet. Based on the extent of the disarray of the closet, the blood on the clothes in and the floor of the closet, and the blood on and damage to the back wall of the closet, including an indentation in the dry wall which Beach testified could have been caused by the back of a person's head, it appeared an altercation had also taken place there. The hanger rod had been removed from the closet and was located in the bedroom. Pieces of a lamp were scattered throughout the bedroom. Outside the closet, there was an indentation on the bedroom wall at knee level. There were apparent bloodstains on the bathroom blinds and a toothbrush and a broken figurine in the bathroom sink. Ron's cell phone was found in the kitchen and the screen had been smashed; car keys were found in the kitchen sink. Blood spatter was found in multiple places in the home: in the living room, outside the bedroom, and on the wall adjacent to where Ron's body was found. There was also blood on a bowl sitting on a chess table. Photographs of Ron taken at the scene show blood on his face and forehead, the left and right sides of his face, and on the back of his head.

D.C. Jackson, a Garland Police Department detective, testified regarding the investigation of Ron's murder and his interview of appellant in conjunction with that investigation. When Jackson asked appellant questions that made him uncomfortable, he became defensive and

–10–

Jackson had to remind appellant several times that he was asking questions that needed to be answered and the questions were not intended to be rude or disrespectful. Appellant told Jackson that Ron knew "not to come at him like that." Appellant told Jackson that he and Ron were ordering drinks at the Twin Peaks restaurant and he had gone outside to smoke. When appellant returned to the table, Ron chastised him because he felt appellant had disrespected him by taking too long to return to the table. Appellant said they finished dinner and continued arguing. Appellant told Jackson that when he returned to Ron's home from Twin Peaks, he was about a third of the way into the living room when Ron "came at him" from Ron's bedroom with a look on his face appellant had seen before. Appellant said he had "gotten that look" from Ron his entire life before Ron physically hurt him and that he had been beaten by Ron when he was a child.

Appellant told Jackson he remembered Ron punching him and he thought "is this really happening?" When Ron punched him a second time, appellant thought, "Oh, my God, please make this stop." Appellant said he could not remember much after Ron punched him a third time, but he believed he caught Ron's wrist or fist. With regard to his lack of memory regarding the incident, appellant felt like he had been asleep but conscious and it was as if someone had "thrown a bag over him" and he was "having a dream." Then everything came back into focus and he saw Ron hurt on the ground. Ron's face was bloody and he no longer looked like himself. Ron was breathing was labored and he was making a gurgling sound. Appellant acknowledged to Jackson that his only injuries consisted of scratches on and swelling of his hand and a broken toe, as depicted in photographs admitted into evidence. Appellant thought Ron was still conscious and he grabbed Ron and held and kissed him. Appellant told Jackson that after he realized the condition Ron was in, he spent time gathering things before he left. Appellant called 9-1-1 on his cell phone and pretended to be neighbor who had heard noises coming from Ron's

–11–

home. Appellant then went to Reiser's home. After his cousin called him and informed him Ron was dead, appellant turned himself in to the police.

Appellant testified at the punishment phase of trial that when he was young, Ron would beat him with a belt after consuming alcohol or ingesting drugs, leaving belt marks from his head to his feet. When Ron left the family, appellant begged Ron to take him with him. Ron declined but indicated appellant could come to live with him when he was fourteen years old. When appellant turned fourteen, he packed his bags to go to live with Ron, but at that time Ron said there was not room in his life for appellant. Appellant was sexually assaulted as a child. When appellant told Ron about the assault, Ron screamed that the allegation was not true and told appellant he needed to forget it happened. Appellant testified the sexual assault "screwed [him] up for the rest of [his] life" and he wanted to kill himself.

Appellant had served in the Navy and was honorably discharged because of a knee injury sustained in a football game. Appellant denied telling people he had served in Iraq or Afghanistan, that he was a sniper, or that he had to shoot children when he was in the military. After appellant was jailed for Ron's murder, he told Reiser on the phone that she might hear about him not being in military combat, but that a large part of his military record is sealed. In his testimony, appellant acknowledged he "might have overstated" his service in the military, and indicated he had never been sent into combat.

According to appellant, he was forty years old when he moved in with Ron. Ron was sixty-five years old at the time of his death. When Michael and Sarita moved into Ron's home, it raised tension in the home. Appellant indicated he had to force Michael to get a job. When Ron thought Michael had stolen marijuana from him, he told appellant to kick Michael and Sarita out of the house. Appellant also stated Sarita "went off" when appellant told her he needed his

automobile she had been driving. At that point, appellant told Michael and Sarita that Ron wanted them out of his home.

Appellant testified Ron had a temper and if appellant spoke up, he would "get smacked upside the head" by Ron, which hurt appellant's feelings. According to appellant, most of the time he and Ron "got into it," appellant would turn and walk away. The night of Ron's death, appellant, his co-worker Smith, and Ron went to the Twin Peaks restaurant, each arriving separately. Appellant was having his first drink when Reiser phoned him, and he went outside and spoke to her for about ten minutes. On his way back into Twin Peaks, a police officer stopped appellant and said he had heard appellant's motorcycle when he arrived and the tailpipes were too noisy. After speaking with the police officer, appellant was returning to the table when his phone rang and indicated Ron had initiated the call. Appellant did not answer the call, and he knew he was in trouble with Ron. When he reached the table, Ron screamed at him about being disrespectful and leaving the table for so long. Appellant leaned over and told Ron not to make a scene and they could talk about it later. The three men finished eating and appellant and Smith went to Smith's truck and drank another beer. Thereafter, appellant and Ron approached one another and in the Twin Peaks parking lot and began arguing. An individual approached them as appellant was walking away; according to appellant, he and the individual then went back into Twin Peaks together.

Appellant testified he stopped to buy cigarettes and beer after leaving the Twin Peaks restaurant and then went to a friend's house to "cool down." Appellant drank "about" two beers at the friend's house and then went to Ron's home. As soon as he was two steps inside the door, he heard Ron screaming loudly. Appellant could not recall what Ron said, but Ron was upset. Appellant was about six feet into the living room area when Ron punched him in the eyes. Appellant indicated Ron had a look in his eyes that appellant had been afraid of his entire life,

and Ron was the scariest human on earth with that look in his eyes. Appellant thought, "oh, God, no. Not again. This is my dad." He testified he felt like he was a little kid again and was scared for his life. When Ron punched appellant a second time, appellant thought, "please, God, make it stop." Appellant remembered grabbing Ron's fist with his hands when Ron was trying to punch him a third time. After he caught Ron's third punch, appellant testified he "blacked out" and does not remember anything. Appellant testified he thought he and Ron had an altercation and appellant knows he caused what was depicted in the photographs of the crime scene introduced into evidence, but he does not remember all of what occurred. He knows he was afraid and did everything possible to keep from being hurt. Appellant testified there was a point where he "kind of regained [his] vision and saw Ron laying on the floor." Appellant stated he tried to help Ron and tried unsuccessfully to reach Reiser by phone so she could help him call 9-1-1.

Appellant called 9-1-1 and, pretending to be Ron's neighbor, stated he heard loud noises at Ron's home. Appellant believes he was outside Ron's home when he called 9-1-1. He remembered going back into Ron's home, and Ron was still breathing at that point. He stated he remembered being bent over Ron's body as if he was performing cardiopulmonary resuscitation (CPR), but does not believe he performed CPR on Ron. Appellant was in Ron's house after making the 9-1-1 call for fifteen minutes before driving away on his motorcycle. According to appellant, he stayed at Ron's home until he heard ambulances about a block away and he then left because he believed Ron would receive medical attention more quickly if he was not present.[3] He testified he drove to a lake and parked for a while and then went to Reiser's home. Appellant and Reiser called hospitals in an attempt to learn more about Ron's condition. Hours

---

[3] At trial, appellant acknowledged that following his arrest, he told Jackson that he waited until he saw flashing lights on arriving vehicles before driving away from Ron's home. However, according to Jackson, surveillance videotape footage from one of Ron's neighbors showed that neither the first nor second police vehicle that arrived at the scene had emergency lights or sirens activated. The first vehicle that arrived at the scene with emergency lights activated was the ambulance which arrived a minute or two after police officers arrived at the scene.

–14–

later, appellant's cousin advised him to call the police because Ron had died. Reiser drove appellant to the Terrell Police Department where he was taken into custody. When he was arrested, appellant told the arresting officers he was not carrying any weapons but "I can be used as a weapon."

Appellant testified that, despite not being able to remember all of what occurred in the altercation with Ron, he did not dispute that he brutally murdered Ron. Appellant told Jackson that it must have been the physical abuse he had suffered as a child at Ron's hands that motivated his actions. Appellant was aware Ron sometimes had shortness of breath and that Ron used an inhaler. Nevertheless, appellant, forty-two years of age, explained that he was in fear of Ron, a sixty-five year old man with COPD, because appellant had asthma and believed Ron was going to physically injure him.

Exhibits were admitted into evidence at the punishment phase of trial regarding various physical altercations involving appellant prior to Ron's death and threats made by appellant prior and subsequent to Ron's death. Appellant also testified regarding these subjects. Appellant reiterated the testimony of his former co-worker at a hospital in Arkansas that appellant was terminated from his position at the hospital as a result of an altercation he had with a security guard. Appellant stated he was upset and had "reverted to alcohol," got drunk, and fell asleep in his car in the parking lot. When he was awakened by the security guard, an altercation ensued. Photographs taken in 2007 were admitted into evidence showing injuries to a former girlfriend's neck and face after appellant pushed her head against a car window. Appellant testified he laughed during Kendall's testimony concerning prior incidents in which he was physically violent with her because he did not push her down as she testified; instead he was drunk, tripped and knocked her down. Appellant testified he did throw a vacuum cleaner at Kendall, but she had also thrown it at him, and he was "not sure what all happened" with regard to the incident in

which he pushed Kendall into a filing cabinet. He recalled saying "homicide or suicide" to Kendall while holding his .357 handgun, but testified he made certain there were no bullets in the gun. Although he had no criminal record, appellant testified regarding "brushes with the law," in which an Arkansas law enforcement officer stopped appellant's vehicle and found a knife and drug paraphernalia in the car and, less than a year later, his ex-wife filed a complaint against him for telephone harassment. Posts from appellant's Facebook account in 2012 referenced his conflict with a neighbor, contained statements that he liked "hospitalizing badged bitches" and that he "almost ended the lives of five society draining idiots this weekend," and included the threat, "You better pray I don't find you first." Appellant acknowledged in his testimony that he had several altercations with law enforcement. The first altercation took place when police arrived at appellant's house and restrained appellant from kicking an individual appellant believed to be stealing an air conditioning unit. The second altercation involved appellant hitting a man during an incident at a gas station that appellant later learned was the local sheriff.

Appellant confirmed he told Jackson that he and Ron had been in a fight about a week before the night Ron died, but testified it was a verbal altercation. Appellant also testified regarding a fight he had at the Twin Peaks restaurant about a week before Ron died. Appellant indicated a restaurant patron was harassing one of the waitresses and appellant told the patron to take his hands off the waitress "and it went from there," with appellant and the patron pushing one another and appellant punching the patron.

Appellant acknowledged sending a threatening text message to Sarita the morning after Ron was killed. He admitted that while in jail following Ron's death, he stated that "if Michael takes anything [appellant will] have two of these charges," and he told his sister that she should let Michael know that when appellant gets out of jail, he will show up at Michael's house and if Michael does not give appellant "his stuff," appellant will hurt him. He also told his cousin that

Michael had better hope appellant cannot find him when he is out of jail and if appellant does not get out of jail, he will find someone to teach Michael a lesson. On another occasion while in jail, appellant was told he would not be allowed to have visitors because he was on suicide watch, and he told Reiser in a phone call that he was threatening the guards, saying that if they kept "pushing" him, "see if I don't hurt one of yall."

### Sufficiency of Evidence to Support Trial Court's Rejection of Affirmative Defense of Sudden Passion

In his first and second points of error, respectively, appellant asserts there is legally and factually insufficient evidence to support the trial court's implied rejection of his affirmative defense that he acted under the immediate influence of sudden passion when he killed Ron.

### *Applicable Law*

Once a defendant has been found guilty of murder, he may raise, at the punishment phase of trial, the issue of whether he caused the death under the immediate influence of sudden passion arising from an adequate cause. TEX. PENAL CODE ANN. § 19.02(d) (West 2011). If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is reduced to a second-degree felony. *See id*.

Under the circumstances of this case, "sudden passion" means "passion directly caused by and arising out of the provocation of the individual killed . . . which passion arises at the time of the offense and is not solely the result of former provocation." *Id*. § 19.02(a)(2). "Adequate cause" is defined as "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id*. § 19.02(a)(1); *see also De Leon v. State*, 373 S.W.3d 644, 650 (Tex. App.—San Antonio 2012, pet. ref'd) ("defendant's fear is only sufficient if the cause of the fear could produce fear that rises to a level of terror which makes a person of ordinary temper incapable of cool reflection"). Neither ordinary fear nor anger alone is sufficient to establish sudden passion. *De*

*Leon*, 373 S.W.3d at 650.  A defendant may not rely on a cause of his own making to support a claim of sudden passion.  *Id*.

Although the issue of sudden passion is a punishment issue, it is analogous to an affirmative defense because the defendant has the burden of proof by a preponderance of the evidence.  *See*  TEX. PENAL CODE ANN. § 19.02(d); *Matlock v. State*, 392 S.W.3d 662, 667 & n. 14 (Tex. Crim. App. 2013).  For this reason, a finding on sudden passion may be evaluated for legal and factual sufficiency.  *Gaona v. State*, 498 S.W.3d 706, 710 (Tex. App.—Dallas 2016, pet. ref'd).

*Standards of Review*

When reviewing a legal sufficiency challenge to an adverse finding on sudden passion, the standard of review is the same as the legal sufficiency standard utilized in civil cases. *Gaona*, 498 S.W.3d at 711–12.  First, we review the record for a scintilla of evidence to support the fact finder's implied finding that appellant did not act in sudden passion, and we disregard all evidence to the contrary unless a reasonable fact finder could not.  *See Matlock*, 392 S.W.3d at 669.  If we find no evidence that supports the fact finder's rejection of appellant's affirmative defense of sudden passion, we search the record to determine whether appellant established, as a matter of law, that he acted under the immediate influence of sudden passion arising from an adequate cause.  *See id*. at 669–70.  If the record reveals evidence supporting appellant's position that he acted under sudden passion, but that evidence was subject to a credibility determination that a reasonable fact finder was entitled to disbelieve, we will not consider that evidence in our matter-of-law assessment.  *See id*. at 670; *see also Gaona*, 498 S.W.3d at 711 (we defer to fact finder's determination of credibility of testimony and weight to give evidence).  We will sustain a legal sufficiency challenge "[o]nly if the appealing party establishes that the evidence conclusively proves his affirmative defense and 'that no reasonable [fact finder] was free to think

–18–

otherwise.'" *Matlock*, 392 S.W.3d at 670 (quoting *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009)).

In making a factual sufficiency claim, appellant is asserting that, considering the entire body of record evidence, the fact finder's adverse finding on his affirmative defense of sudden passion was so "against the great weight and preponderance" of that evidence as to be manifestly unjust. *Id.* at 671. In the factual sufficiency review of a rejected affirmative defense, an appellate court views the entirety of the evidence in a neutral light, but it may not usurp the function of the fact finder by substituting its judgment in place of the fact finder's assessment of the weight and credibility of witness testimony. *Id.* Therefore, an appellate court must sustain a factual sufficiency claim only if, after setting out the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, the court clearly states why the verdict is so much against the great weight of the evidence as to be "manifestly unjust, conscience-shocking, or clearly biased." *Id.*

*Analysis*

In support of his affirmative defense of sudden passion, several witnesses, including appellant, testified Ron had physically abused appellant with a belt when appellant was a child. Appellant testified Ron's physical abuse of him took place in conjunction with Ron's consumption of alcohol or ingestion of drugs. There is testimony of record indicating that at the time of Ron's death he had not consumed alcohol in seventeen years, however Ron did smoke marijuana. As an adult, appellant moved into Ron's home and both appellant and Reiser testified Ron would slap appellant in the head when he was frustrated with appellant. Appellant testified Ron had a temper and normally when the two of them "got into it," appellant would walk away. However, Sarita testified frequent arguments between Ron and appellant were always appellant's fault, and Ron would remain calm because he did not like "drama."

–19–

Appellant testified that as he entered Ron's home after dinner at the Twin Peaks restaurant, Ron remained angry about a perceived slight at the restaurant when Ron stepped outside to take a phone call. Ron had a look in his eyes that evoked fear in appellant because it was reminiscent of looks appellant received from Ron prior to physical abuse by Ron during appellant's childhood. According to appellant, Ron struck him with two blows and then struck again a third time but the punch was blocked by appellant. Appellant could not testify as to events immediately following his block of Ron's third punch, but when the scene returned to "focus" for appellant, he realized Ron had been severely injured in the altercation between the two of them. Appellant told Humiston he never meant to kill Ron and told Jackson that his childhood beatings by Ron must have driven him to do what he did.

The State offered evidence that appellant was a much younger, larger, and agile man than his father. At the time of his death, Ron was sixty-five years of age, weighed 130 pounds, was frail, and suffered from COPD. Appellant was soon to be forty-two years of age and was "twice" the size of Ron. Evidence established appellant was an angry and violent individual, especially after he consumed alcohol, as demonstrated by many incidents of verbal arguments with family and threatened or actual physical violence against family members and others. Appellant's violence and aggression escalated in advance of Ron's death, including a physical altercation between appellant and a patron of the Twin Peaks restaurant about a week before Ron's death and an argument with Ron at Twin Peaks the evening of Ron's death. Sarita and Michael testified they had stopped attending family night out at Twin Peaks in order to avoid appellant's arguments with Reiser and Ron as well as appellant's anger and aggression directed at members of the household when they returned home from Twin Peaks. Although appellant testified Michael and Sarita moved from Ron's home shortly before Ron's death because it was suspected Michael had stolen marijuana from Ron and Sarita behaved inappropriately when

appellant told her to return his car, Sarita and Michael testified they moved out of Ron's home because they were afraid of appellant.

Testimony established that on the night of Ron's death, appellant was aggressive at the Twin Peaks restaurant while Ron exhibited no particular aggression other than criticizing appellant's absence from the restaurant while on the phone. Specifically, Smith testified appellant behaved more aggressively than Ron while at the dinner table. Rogers testified that when he saw Ron and appellant arguing in the Twin Peaks parking lot, he intervened because of the disparity in their ages and the fact that appellant appeared to be the aggressor in the argument. Appellant turned on Rogers and told him he had killed people as a Marine. Additional testimony established appellant behaved more aggressively and angrily when he drank alcohol, and on the night of Ron's death, appellant drank alcohol at Twin Peaks, and later at a friend's house, before returning to Ron's home. Appellant called his mother shortly after he killed Ron and told her he and Ron had gotten into an argument and then subsequently a fight. After Ron died, appellant told Reiser that he knew something was going to happen the night Ron died and he knew he should not return to Ron's home.

Ron died from blunt force injuries that were sustained all over his body from his head to his lower extremities. COPD contributed to the cause of death because it exacerbated Ron's breathing difficulties following the beating that resulted in fractured ribs, damage to lung tissue, and bleeding in his chest cavity. The severity of injuries to Ron's face was depicted in photographs admitted in evidence and appellant's own testimony that Ron did not look like himself following the altercation. The evidence indicated the altercation occurred throughout a number of rooms in Ron's home as evidenced by blood and blood splatter as well as household items that were damaged, broken, or in disarray.

Finally, the State offered evidence concerning appellant's credibility. Sarita testified one cannot tell when appellant is telling the truth. Appellant denied in his testimony making statements he served in the military as a sniper, was deployed in Iraq and Afghanistan, and was required to shoot children. Yet while in jail on charges filed in this case, appellant spoke to Reiser about the "awful things" he had to do in Iraq and Afghanistan, including killing people. Appellant told Reiser she might hear he had not served in military combat, but a large portion of his military record is "sealed." In his testimony, appellant acknowledged he "might have overstated" the extent of his military service and stated he had never served in combat.

The State's evidence suggests appellant was predisposed to act in an aggressive manner toward Ron throughout the evening of Ron's death, and that his aggression was not the result of passion arising from any specific provocation by Ron at the time of the offense that would produce a degree of anger, rage, resentment or terror that would render a person of ordinary temper incapable of cool reflection. *See* TEX. PENAL CODE ANN. §§ 19.02(a)(1), 19.02(d) ("sudden passion" means "passion directly caused by and arising out of the provocation of the individual killed . . . which passion arises at the time of the offense and is not solely the result of former provocation"); *see also De Leon*, 373 S.W.3d at 650. A defendant may not rely on a cause of his own making to support a claim of sudden passion, *De Leon*, 373 S.W.3d at 650, and the State's evidence indicates appellant was the aggressor in his interactions with Ron throughout the evening of Ron's death. While appellant's version of the events on the evening of Ron's death is different, the weight and credibility of his testimony is a determination for the fact finder to which we must defer. *See Gaona*, 498 S.W.3d at 711. Because appellant's testimony supporting his position he acted under sudden passion is subject to a credibility determination and the fact finder is entitled to disbelieve the testimony, we do not consider that evidence in our matter-of-law assessment. *See Matlock*, 392 S.W.3d at 670. There is more than

–22–

a scintilla of evidence to support the trial court's implied negative finding on sudden passion. *See id*. at 669.

With respect to the factual sufficiency of the evidence to support the trial court's implied negative finding on appellant's claim of sudden passion arising from adequate cause, we view the entirety of the evidence in a neutral light, but we may not usurp the function of the fact finder by substituting our judgment in place of the fact finder's assessment of the weight and credibility of witness testimony. *Matlock*, 392 S.W.3d at 671. As the fact finder in this case, the trial court could have reasonably believed on this record that appellant was an aggressive and violent individual, particularly when under the influence of alcohol, and that appellant continued to escalate an argument with Ron that had begun at the Twin Peaks restaurant until it culminated in appellant beating Ron to death in his own home. On this record, the fact finder could have reasonably disbelieved appellant's rendition of events, including his testimony that despite the disparity in their physical stature and health, appellant feared for his life in a fight initiated by Ron and was motivated in his actions by passion resulting from childhood memories of Ron beating him with a belt. The trial court could have reasonably concluded, based on the amount of time passing between the earlier argument with Ron at Twin Peaks and the escalated argument later in Ron's home, as well as the time necessary for appellant to have inflicted the massive injuries to Ron and damage to numerous rooms and articles in Ron's home, that appellant had the capacity for cool reflection and could have stopped short of murdering Ron but chose not to do so. After reviewing all the evidence relevant to sudden passion in a neutral light, we cannot conclude that the trial court's implied negative finding on appellant's claim of sudden passion arising from adequate cause "is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *See id*.

We resolve appellant's first and second points of error against him.

## Sufficiency of Evidence of Murder

In his third point of error, appellant argues the trial court erred by not finding him guilty of the lesser-included offense of manslaughter because there was insufficient evidence he intentionally or knowingly caused Ron's death. The State responds that the evidence is sufficient to establish the elements of murder as charged in the indictment.

Appellant was indicted on a charge of murder. Responding to questions from the trial court at the plea hearing, appellant stated he understood he was charged with the first-degree felony offense of murder and the range of punishment for that offense. He answered affirmatively that he, his attorney, and the State had agreed that he and the State would waive a jury, he intended to plead guilty to murder, and he would be "going open" to the trial court for assessment of punishment. He affirmatively responded he knew the trial court could assess punishment "anywhere within the range of punishment." Appellant's attorney stated he believed appellant was mentally competent. Appellant pleaded guilty freely and voluntarily to the offense charged. The trial court accepted appellant's plea of guilty to the offense of murder as charged in the indictment and approved and signed appellant's judicial confession and stipulation of evidence. In answer to his attorney's questioning, appellant testified he had pleaded guilty to the charge of murder and had done so freely and voluntarily.

Article 1.15 of the code of criminal procedure provides that when a defendant pleads guilty, he cannot be convicted upon his plea alone without sufficient evidence to support the plea. *See* TEX. CODE CRIM. PROC. ANN. art. 1.15 (West 2005); *see also Wright v. State*, 930 S.W.2d 131, 132 (Tex. App.—Dallas 1996, no pet.). Article 1.15 provides in pertinent part:

> No person can be convicted of a felony except upon the verdict of a jury duly rendered and recorded, unless the defendant, upon entering a plea, has in open court in person waived his right of trial by jury in writing in accordance with Articles 1.13 and 1.14; provided, however, that it shall be necessary for the state to introduce evidence into the record showing the guilt of the defendant and said evidence shall be accepted by the court as the basis for its judgment and in no

–24–

event shall a person charged be convicted upon his plea without sufficient evidence to support the same.

TEX. CODE CRIM. PROC. ANN. art. 1.15.

Before 1931, a conviction for a felony offense could not be obtained without a jury verdict. *See Ex parte Williams*, 703 S.W.2d 674, 678 (Tex. Crim. App. 1986). In 1931, the predecessor statute to article 1.15 was amended "to permit a defendant to waive a jury trial and enter a plea of guilty before the court in a felony case less than capital." *Id.* That legislation provided the trial court was to accept evidence as the basis for its "verdict" and "in no event shall a person charged be convicted upon his plea of guilty without sufficient evidence to support the same." *Bolton v. State*, 123 Tex. Crim. 543, 545, 59 S.W.2d 833, 834 (1933) (per curiam) (discussing the predecessor to article 1.15).[4] This afforded a defendant "an additional procedural safeguard required by the State of Texas but not by federal constitutional law." *Ex parte Williams*, 703 S.W.2d at 678. "Since there would no longer be a verdict of one's peers before a defendant was sent to prison, the statute required sufficient evidence to support the judgment where he entered a guilty plea before the court to a non-capital felony." *Id.*

The State contends appellant's judicial confession is sufficient evidence under article 1.15 of the code of criminal procedure to sustain a conviction upon a guilty plea. In his appellate brief, appellant acknowledges a judicial confession, standing alone, constitutes sufficient evidence to support a guilty plea. *See Dinnery v. State*, 592 S.W.2d 343, 353 (Tex. Crim. App. [Panel Op.] 1979) (op. on reh'g). A trial court is not obliged to *sua sponte* withdraw a defendant's plea of guilt so long as the court fulfills its obligation to consider the evidence submitted even if evidence is adduced that reasonably and fairly raises an issue as to the

---

[4] Article 1.15 differs from the predecessor statute in that it requires the trial court to accept evidence to support its "judgment," not its "verdict." *See Bolton*, 59 S.W.2d at 834.

defendant's guilt. *Aldrich v. State*, 104 S.W.3d 890, 893 (Tex. Crim. App. 2003); *Williams v. State*, 191 S.W.3d 242, 260 (Tex. App.—Austin 2006, no pet.).[5]

Our appellate "sufficiency" review of non-capital felony guilty pleas to the court is confined to determining whether sufficient evidence supports the judgment of guilt under article 1.15. *See* TEX. CODE CRIM. PROC. ANN. art. 1.15; *McGill v. State*, 200 S.W.3d 325, 330 (Tex. App.—Dallas 2006, no pet.); *Keller v. State*, 125 S.W.3d 600, 604–05 (Tex. App.—Houston [1st Dist.] 2003), *pet. dism'd*, *improvidently granted*, 146 S.W.3d 677, 678 (Tex. Crim. App. 2004) (per curiam).[6] Although the State must introduce evidence into the record establishing the defendant's guilt, *see* TEX. CODE CRIM. PROC. ANN. art. 1.15, there is no requirement that the supporting evidence prove the defendant's guilt beyond a reasonable doubt. *McGill*, 200 S.W.3d at 330. Rather, the supporting evidence must simply embrace each essential element of the offense charged. *See Stone v. State*, 919 S.W.2d 424, 427 (Tex. Crim. App. 1996); *McGill*, 200 S.W.3d at 330.

The penal code provides in pertinent part that a person commits the offense of murder if he "intentionally or knowingly causes the death of an individual" or "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(1) & (2). In this case, the indictment tracked the language of the statute and alleged that appellant:

> did unlawfully then and there intentionally and knowingly cause the death of RONNIE DEBUSK, an individual, hereinafter called deceased, by INFLICTING BLUNT FORCE INJURIES TO DECEASED WITH DEFENDANT'S HAND, A DEADLY WEAPON, AND AN UNKNOWN OBJECT, a deadly weapon, THE EXACT NATURE AND DESCRIPTION OF WHICH IS UNKNOWN AND UNKNOWABLE TO THE GRAND JURY,

---

[5] *See also Moses v. State*, No. 05-07-01232-CR, 2008 WL 2579684, at *1 (Tex. App.—Dallas June 30, 2008, no pet.) (not designated for publication).

[6] *See Burks v. State*, No. 05-08-01677-CR, 2010 WL 2653630, at *1 (Tex. App.—Dallas July 6, 2010, no pet.) (not designated for publication).

And further did unlawfully then and there intend to cause serious bodily injury to RONNIE DEBUSK, hereinafter called deceased, and did then and there commit an act clearly dangerous to human life, to-wit: by INFLICTING BLUNT FORCE INJURIES TO DECEASED WITH DEFENDANT'S HAND, A DEADLY WEAPON, AND AN UNKNOWN OBJECT, a deadly weapon, THE EXACT NATURE AND DESCRIPTION OF WHICH IS UNKNOWN AND UNKNOWABLE TO THE GRAND JURY, and did thereby cause the death of RONNIE DEBUSK, an individual[.]

In this case, the indictment tracked the language of section 19.02(b)(1) and (2). *See id.*

Without objection, appellant's signed judicial confession and stipulation of evidence was admitted into evidence, wherein appellant judicially confessed he committed the offense of murder exactly as alleged in the indictment, that is, he intentionally and knowingly caused the death of Ron with a deadly weapon and intended to cause serious bodily injury to Ron and committed an act clearly dangerous to human life by inflicting blunt force injuries to Ron with a deadly weapon thereby causing Ron's death. *See id.* A judicial confession, standing alone, is sufficient to sustain a conviction based on a guilty plea and satisfies the requirements of article 1.15 as long as it embraces every element of the charged offense. *Menefee v. State*, 287 S.W.3d 9, 13 (Tex. Crim. App. 2009); *Dinnery*, 592 S.W.2d at 353; *Ross v. State*, 931 S.W.2d 633, 635 (Tex. App.—Dallas 1996, no pet.).[7] Appellant's judicial confession that he committed the offense of murder was sufficient to support his plea of guilty in this case, *see Menefee*, 287 S.W.3d at 13, and the State complied with article 1.15 by presenting sufficient evidence to support the judgment of guilt. *See* TEX. CODE CRIM. PROC. ANN. art. 1.15; *McGill*, 200 S.W.3d at 300. We resolve appellant's third point of error against him.

---

[7] *See Davis v. State*, No. 05-15-00552-CR, 2016 WL 3876586, at *4 (Tex. App.—Dallas July 12, 2016, no pet.) (mem. op., not designated for publication).

## Punishment Assessed

In his fourth point of error, appellant contends the trial court abused its discretion by sentencing him to fifty years' imprisonment. Appellant argues the punishment imposed "violates the objectives of the system of prohibitions, penalties, and correctional measures" in the penal code with respect to rehabilitation and preventing recurrence. *See* TEX. PENAL CODE ANN. § 1.02 (West 2011). The State responds that appellant has not preserved his complaint because he failed to raise an objection in the trial court regarding the sentence imposed. Alternatively, the State argues appellant's sentence is within the applicable sentencing range for murder and is appropriate under the facts and circumstances of this case. Appellant concedes the punishment assessed is within the statutorily authorized range of punishment for murder, but argues the trial court refused to consider the purported mitigating circumstances in appellant's case.

As appellant acknowledges, he did not complain about the sentence either at the time it was imposed or in a motion for new trial. *See* TEX. R. APP. P. 33.1(a)(1); *Castaneda v. State*, 135 S.W.3d 719, 723 (Tex. App.—Dallas 2003, no pet.) (to preserve error, appellant must make a timely request, objection, or motion). As a result, he has not preserved this argument for our review. *See* TEX. R. APP. P. 33.1(a)(1); *Castaneda*, 135 S.W.3d at 723.[8]

Moreover, appellant's complaint is not supported by the record. Appellate courts review a sentence imposed by a trial court for abuse of discretion. *Jackson v. State*, 680 S.W.2d 809, 814 (Tex. Crim. App. 1984). In reviewing "a trial judge's determination of the appropriate punishment in any given case a great deal of discretion is allowed the sentencing judge." *Id.* Additionally, as a general rule, punishment that is assessed within the statutory range for an

---

[8] *See also Austin v. State*, No. 05-16-00531-CR, 2017 WL 1245420, at *1 (Tex. App.—Dallas Apr. 5, 2017, no pet.) (mem. op., not designated for publication); *Adepegba v. State*, No. 05-15-01139-CR, 2016 WL 5819232, at *2 (Tex. App.—Dallas Oct. 5, 2016, no pet.) (mem. op., not designated for publication).

offense will not be disturbed on appeal. *See id.*[9] Murder is a first-degree felony. TEX. PENAL CODE ANN. § 19.02(c).[10] The punishment range for a first-degree felony is imprisonment for life or for a term of not more than ninety-nine years or less than five years, with an optional fine not to exceed $10,000. *Id.* § 12.32 (West 2011). Appellant's fifty-year sentence is within the punishment range for this first-degree felony offense, and punishment assessed within the statutory range of punishment does not fail to comport with the rehabilitation and prevention-of-recurrence objectives of the Texas Penal Code. *See Carpenter v. State*, 783 S.W.2d 232, 232–33 (Tex. App.—Dallas 1989, no pet.); *see also Jackson*, 680 S.W.2d at 814 (as a general rule, sentence within proper punishment range will not be disturbed on appeal).[11]

Appellant acknowledges that, as a general rule, a sentence within the proper range of punishment will not be disturbed on appeal. *See id.* He also concedes his sentence was within the statutorily authorized range of punishment for murder. *See* TEX. PENAL CODE ANN. § 12.32(a). However, he argues the trial court "refused to consider the mitigating circumstances" and the "copious evidence to set the background for why and how [he] physically responded" to an alleged attack by Ron on the night of the murder. According to appellant, his "lifelong struggle with depression, his molestation as a young child that forever affected him, his deep remorse over the situation, and because there is a lack of evidence he will reoffend in the future," the trial court abused its discretion by assessing "such a steep sentence" in this case.

There is nothing in the record to indicate that the trial court failed to consider mitigating evidence. Although he recounts purported "mitigating circumstances," appellant points to

---

[9] *See also Balderas v. State*, No. 05-14-01081-CR, 2015 WL 3814354, at *3 (Tex. App.—Dallas June 18, 2015, pet. ref'd) (mem. op., not designated for publication) (in general, punishment within statutory range provided by legislature is not excessive, cruel, or unusual, and will not be disturbed on appeal).

[10] If a defendant proves by a preponderance of the evidence at the punishment phase of trial that he caused the death under the immediate influence of sudden passion arising from an adequate cause, the offense is a second-degree felony. TEX. PENAL CODE ANN. § 19.02(d).

[11] *See also Austin*, 2017 WL 1245420, at *2.

nothing in the record supporting the contention the trial court failed to consider them, and we found nothing in the record to indicate the trial court did not consider those factors. To the contrary, at the close of the evidence in the punishment phase, the trial court stated:

> Mr. DeBusk, as I have sat here over the next – the last couple of days and listened to this trial, several things occurred to me. One is how tragic this is . . . for the entire family. I've thought of the story of Cain and Abel, and two brothers that were treated differently and how they responded. I've thought also about the power of forgiveness and how devastating it is when you don't forgive and how that harms you more than it harms the other person.
>
> * * *
>
> It's sad. But I have a job to do, and I'm going to do my job.
>
> Based upon the evidence that I've heard, the testimony that I've listened to, the exhibits that I've seen, I'm going to assess your punishment today at 50 years imprisonment . . . .

We conclude that, on the record in this case, trial court did not abuse its discretion by sentencing appellant to fifty years' imprisonment. We resolve appellant's fourth point of error against him.

## Modification of Judgment

In his fifth point of error, appellant contends the trial court's judgment should be modified to reflect there was no plea bargain agreement. The State agrees the judgment should be modified as appellant requests.

The judgment shows the terms of a plea bargain as "50 YEARS PENITENTIARY: NO FINE." However, appellant entered an open guilty plea to the charge in the indictment. We resolve appellant's fifth point of error in his favor. We modify the trial court's judgment to show the terms of appellant's plea bargain was "open." *See* TEX. R. APP. P. 43.2(b); *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd).

–30–

**Conclusion**

We modify the trial court's judgment to show the terms of appellant's plea bargain was "open." As modified, we affirm the trial court's judgment.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
160947F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

STEVEN CRAIG DEBUSK, Appellant

No. 05-16-00947-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 3, Dallas County, Texas,
Trial Court Cause No. F-1524552-J.
Opinion delivered by Justice Fillmore, Justices Whitehill and Boatright participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** to show the term of Steven Craig Debusk's plea bargain was "open."  As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered this 27th day of July, 2017.